**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBERT GARFIELD, individually and on behalf of all others similarly situated,<br><br>                 Plaintiff,<br><br>   vs.<br><br>FLAGSTAR FINANCIAL INC., f/k/a NEW YORK COMMUNITY BANCORP, INC., THOMAS R. CANGEMI, JOHN J. PINTO, ROBERT WANN, ALESSANDRO P. DINELLO, DOMINICK CIAMPA, HANIF W. DAHYA, LESLIE D. DUNN, JAMES J. O'DONOVAN, LAWRENCE ROSANO, JR., RONALD A. ROSENFELD, DAVID TREADWELL, and LAWRENCE J. SAVARESE,<br><br>                 Defendants. | NO.:<br><br><u>CLASS ACTION</u><br><br>**COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933**<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Robert Garfield ("Plaintiff"), individually and on behalf of a class of all other similarly situated investors, alleges the following based upon personal knowledge as to Plaintiff and his own acts, and otherwise based upon the investigation conducted by and through Plaintiff's attorneys. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein.

### SUMMARY OF ACTION

1.      This is a securities class action on behalf of all persons who acquired New York Community Bancorp, Inc. ("NYCB")[1] common stock in exchange for FlagstarBank N.A., f/k/a Flagstar Bancorp, Inc. ("Flagstar") securities pursuant to the S-4 registration statement, 424B3 prospectus, and materials incorporated therein (collectively, the "Registration Statement" or

_____

[1] NYCB is now known as Flagstar Financial, Inc.

"Offering Documents") issued in connection with the transaction pursuant to which NYCB acquired and merged with Flagstar (the "Merger"). The Merger, announced in April 2021, closed on December 1, 2022.

2.　　Plaintiff asserts non-fraud strict liability claims for relief under §§11, 12(a)(2), and 15 of the Securities Act of 1933 ("1933 Act" or "Securities Act") against NYCB, and negligence claims against certain current and former directors and officers of NYCB and Flagstar.

3.　　Prior to the Merger, Flagstar was the holding company for Flagstar Bank, a federally chartered stock savings bank founded in 1987, with consolidated total assets of $29.4 billion. Flagstar's common stock was traded on the NYSE under the symbol "FBC."

4.　　Prior to the Merger, Defendant NYCB was the bank holding company for regional bank, New York Community Bank, which operated as one of the largest regional banks in the nation. NYCB's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "NYCB." NYCB claims to have been in existence for 165 years and is known as a commercial real estate ("CRE") lender to multi-family landlords and other non-residential commercial property owners in the New York metro area.

5.　　Pursuant to an Agreement and Plan of Merger dated April 24, 2021 ("Merger Agreement"), as amended on April 26, 2022 and October 27, 2022, Defendants (defined below) solicited and sold directly to Plaintiff and other former Flagstar stockholders approximately 214 million newly issued shares of NYCB common stock pursuant to a uniform stock-for-stock exchange (the "Merger Exchange"), pursuant to which each share of Flagstar common stock was converted into the right to receive 4.0151 shares of NYCB common stock, with fractional shares converted into cash. Each newly issued share of NYCB common stock in the Merger was

registered, solicited, and sold to Plaintiff and other former Flagstar shareholders directly in the Merger pursuant to the Offering Documents.

6.      The Merger was approved separately by NYCB and Flagstar stockholders on August 4, 2021 pursuant to a joint proxy statement and prospectus originally filed as part of Form S-4 filed on June 11, 2021, as amended.

7.      The Offering Documents issued to pitch the Merger were materially false and misleading and omitted material facts both required by governing SEC regulations and necessary to make the statements made not misleading. Plaintiff alleges that the Offering Documents misrepresented and omitted material facts regarding weaknesses in NYCB's internal controls, ineffective oversight, risk assessment and monitoring over its internal loan reviews; misrepresented that the financial statements had been prepared in compliance with Generally Accepted Accounting Principles ("GAAP") which they were not, as they materially overstated over-stated NYCB's income from operations, goodwill, and total assets and understated NYCB's expenses and losses; and misrepresented the quality and effectiveness of the Company's underwriting and risk management systems.

8.      The Offering Documents also falsely attested that the NYCB financial statements contained therein were prepared in accordance with Generally Accepted Accounting Principles ("GAAP") which they were not. For example, Defendants had failed to properly test for impairment of goodwill from NYCB's historical transactions (2007 and prior).  This caused NYCB to materially understated its expenses and losses and materially overstated NYCB's income from operations, goodwill, and total assets in contravention of GAAP. Accordingly, Defendants' false and misleading representations and omissions in the Offering Documents that goodwill was not

3

impaired, as well as their representations about other financial metrics, were materially false and misleading.

9.      The Offering Documents falsely misrepresented the procedure employed by NYCB to conduct goodwill impairment testing policies, procedures, and practices. Had Defendants reasonably conducted goodwill impairment testing as required by GAAP, the financial statements incorporated into the Offering Documents would have accounted for and disclosed NYCB's already existing and internally apparent material impairment of goodwill and related assets.

10.      In addition, Defendants advised Plaintiff and the investing public that NYCB's underwriting and risk management systems were "rigorous," "stringent," and "conservative." However, NYCB's underwriting and risk management systems were not rigorous, stringent, or conservative, but were not effective and suffered from material weaknesses. The Offering Documents' representations about NYCB's underwriting and risk management systems and protocols were false and misleading because, *inter alia*, NYCB lacked "conservative lending policies" and "rigorous underwriting standards." NYCB's loan portfolio was already rife with poor quality CRE and multifamily loans, and NYCB did not "originate CRE loans in adherence with conservative underwriting standards" as represented in the Offering Documents.

11.      As of the Merger, NYCB's CRE portfolio already faced severe and compounding risks from interest rate hikes and vacancies, including in Manhattan where approximately half of NYCB's office portfolio is located. Not only did NYCB's multifamily loans face risks from rising interest rates but a 2019 law in New York was enacted that capped the amounts that landlords could raise rents at the rent-stabilized properties. It was inevitable that NYCB's prospective loan losses

ballooned and, ultimately the Company needed to take a $552 million provision for credit losses in connection with its CRE and multi-family portfolio.

12.     Defendants also violated SEC Regulation S-K, 17 C.F.R. §229.105, Risk Factors, ("Item 105"), which requires companies, in the "Risk Factor" section of the Registration Statement, to discuss the most significant factors that made the offering risky or speculative, and that each risk factor adequately describe the risk. NYCB's risk factors did not even mention, much less adequately describe, the severe risks posed by NYCB's later revealed ineffective internal controls over financial reporting, nor did they discuss NYCB's already ineffective tracking of loan risks, NYCB's already ineffective oversight, risk assessment, and monitoring activities, NYCB's already ineffective and materially deficient underwriting and risk management systems, NYCB's already vulnerable loan portfolio assets including poor quality commercial real estate and multifamily loans, NYCB's already impaired goodwill from NYCB's historical transactions (2007 and prior) as of the Merger, or that NYCB's financial statements violated GAAP in numerous respects. To the extent the Offering Documents made any passing reference to these risks whatsoever, it did so only in vague, generic, and non-specific terms that did not disclose the true scope and severity of material risks posed, much less adequately describe those risks as required by Item 105.

13.     Third, Defendants' failure to disclose the material information described above, much less the materially adverse effects of the undisclosed information on the Company's future results, share price, and prospects, rendered false and misleading the Offering Documents' many references to risks.

14.     After the Merger, the consequences from Defendants' materially false and misleading statements and omissions gradually materialized.

15.     On January 31, 2024, NYCB shocked the market with news of a fourth quarter net loss of $252 million due to a $552 million provision for loan losses—an 800% increase from the prior quarter.  In connection with these devastating results, NYCB was forced to preserve capital by slashing its dividend by 71%, from $0.17 to $0.05.  News of the Bank's decision to cut its dividend and set aside over half a billion dollars for potential loan losses—ten times greater than analyst expectations - rattled the market, with one analyst noting: "Something has clearly changed in their tone . . . What changed?  When did it change?"  Following this news, shares of NYCB plunged by as much as 46% in intraday trading, ultimately closing 38% lower on January 31, 2024 at $19.41 per share - the stock's worst one-day drop on record.

16.     Defendants' documents downplayed the severity of the news and calm the market's reaction by alleging that the increased loss reserves and charge offs were "proactive" and "necessary enhancements that come with being a $100 billion plus Category IV bank," rather than indicative of any true deterioration in the asset quality of the CRE loan portfolio.

17.     O n  February 5, 2024, *Bloomberg* reported that, rather than being "proactive," NYCB was forced to take "drastic financial moves" in response to "behind-the-scenes conversations with" and in the face of "mounting pressure from a top US watchdog." *Bloomberg* further revealed that amidst this "mounting pressure," two executives responsible for managing risk at the Bank— its Chief Risk Officer, Nicholas Munson, as well as its Chief Audit Executive— had been removed in prior months, leaving NYCB without anyone in this critical position. This news was disturbing, because, as media reports noted, the dramatic and simultaneous collapses in 2023 of two other similarly-sized banks were linked to the sudden departures of their chief risk officers.  On this news, NYCB's stock dropped an additional 22% by the close of trading on February 6, 2024.

18.     Shortly thereafter, credit rating agency Moody's slashed the Company's corporate debt rating to "junk," and NYCB announced a massive shakeup in its leadership wherein Defendant Cangemi would now report to the newly elevated Executive Chairman, Defendant Alessandro DiNello. *The Wall Street Journal* reported that "[DiNello] said he was coming in to right the ship."

19.     On February 29, 2024, NYCB delayed the filing of its Form 10-K, recognized a staggering charge of $2.4 billion in goodwill - belatedly recognizing that the entirety of its goodwill from historical transactions (2007 and prior) was fully impaired (reducing income by the same amount), and made some startling revelations: the Bank's "*laser focus[] on credit quality*" and "*comprehensive risk framework*" were a fabrication. The Bank revealed "material weaknesses in the Company's internal controls related to internal loan review, resulting from *ineffective oversight, [ineffective] risk assessment and [ineffective] monitoring activities*."

20.     As further explained in the Company's delayed Form 10-K, these material weaknesses meant that NYCB's (a) "internal loan review processes lacked an appropriate framework to ensure that ratings were consistently accurate, timely, and appropriately challenged," (b) "ineffective controls impact[ed] the Company's ability to accurately disclose loan rating classifications, identify problem loans, and ultimately [recognize] the allowance for credit losses on loans and leases," and (c) with respect to its "periodic risk assessment," the Company lacked processes "to identify and timely respond to emerging risks in . . . internal loan review, that were responsive to changes in the business operations and regulatory and economic environments in which the Company operates."

21.     These devastating revelations and disclosures caused the price of NYCB common stock to fall yet again, dropping 26% on March 1, 2024 and then another 23% on March 4, 2024,

closing at $8.19 per share. On March 6, 2024, trading halted on the NYSE as NYCB shares plunged further and traded as low as $5.10.

22.     With these further revelations, the price of NYCB common stock declined even further, falling to a close of $3.55 per share on March 1, 2024, and $2.73 per share on March 4, 2024. On March 6, 2024, trading halted as NYCB shares further plunged and traded as low as $1.70.

23.     Subsequently, NYCB raised $1.05 billion from a consortium of investors including former U.S. Treasury Secretary, Steven Mnuchin, which was approved by stockholders on June 5, 2024.

24.     The full scope of Defendants' misrepresentations and omissions has continued to gradually emerge across a series of disclosures, executive departures, dividend cuts, other materialization of risks, and related stock price declines.

25.     Plaintiff and other former Flagstar investors have suffered severe losses as a result of Defendants' deception.

## JURISDICTION AND VENUE

26.     The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l, and 77o.

27.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act, 15 U.S.C. § 77v.

28.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 22 of the Securities Act, 15 U.S.C. § 77v.

29.     NYCB maintains its corporate headquarters in Hicksville, New York, which is situated in this District, conducts substantial business in this District, and many of the acts and

conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails, interstate telephone communications, and the facilities of the motional securities markets.

## PARTIES

30.     Plaintiff Robert Garfield directly acquired 40 newly issued shares of NYCB common stock in the Merger, in exchange for 10 Flagstar shares, pursuant to the Offering Documents and was damaged thereby, as set forth in his Certification submitted herewith.

31.     Defendant NYCB was a bank holding company incorporated under Delaware law which maintained its principal executive offices at 102 Duffy Avenue, Hicksville, New York 11801. NYCB is the issuer and a direct seller of all shares of NYCB common stock sold to Plaintiff and other former Flagstar shareholders in the Merger, and Defendants NYCB and the other Defendants conceived, negotiated, and controlled the Merger and the Offering Documents filed in connection with the Merger. On October 8, 2024, NYCB's Board of Directors ('Board") approved an amendment to the Company's Amended and Restated Certificate of Incorporation (the "Certificate of Incorporation") changing the Company's name from New York Community Bank, Inc. to Flagstar Financial, Inc. ("New Flagstar"). As of October 28, 2024, NYCB trades on the New York Stock Exchange under the symbol "FLG".

32.     Defendant Thomas R. Cangemi ("Cangemi") served as President and CEO of NYCB from December 31, 2020 until February 23, 2024, when he resigned effective immediately. When he was appointed CEO in December 2020, Cangemi was also appointed as member of NYCB's Board of Directors ("Board") and served as Chairman of the Board from March 26, 2021

to November 30, 2022. Cangemi resigned as a member of NYCB's Board on March 11, 2024. Cangemi had a long career with NYCB, first joining the Company on July 31, 2001, and from April 5, 2005 through December 30, 2020, served as the Company's Senior Executive Vice President and CFO. Defendant Cangemi reviewed, contributed to, and signed the Offering Documents.

33.     Defendant John J. Pinto ("Pinto") served as the Company's Chief Financial Officer ("CFO") from December 31, 2020, and Senior Executive Vice President from February 5, 2021, until he ceased serving in those roles on or about April 12, 2024. After joining NYCB on July 31, 2001, Pinto served as Executive Vice President and Chief Accounting Officer of the Company from April 5, 2005 until he was promoted to CFO. Defendant Pinto reviewed, contributed to, and signed the Offering Documents.

34.     Defendant Robert Wann ("Wann") was Senior Executive Vice President, Chief Operating Officer ("COO") until his retirement from that position at the end of 2022 and was a member of NYCB's Board of Directors since at least December 2007 until his retirement, effective March 11, 2024. Defendant Wann reviewed, contributed to, and signed the Offering Documents.

35.     Defendant Alessandro P. DiNello ("DiNello") was President and CEO of Flagstar prior to the Merger. DiNello joined NYCB's Board of Directors as a Non-Executive Chairman in connection with the Merger. DiNello signed a form pursuant to Rule 438 of the Securities Act in which he consented to being named as a prospective director in the Registration Statement. He reviewed, contributed to, and signed the Offering Documents.

36.     Defendant David Treadwell ("Treadwell") was a director of Flagstar prior to the Merger. Treadwell joined NYCB's Board as the Chairman of the Risk Assessment Committee in connection with the Merger. Treadwell signed a form pursuant to Rule 438 of the Securities Act in

which he consented to being named as a prospective director in the Registration Statement. Treadwell reviewed and contributed to the Offering Documents.

37. Defendant Dominick Ciampa ("Ciampa") was a Director of NYCB since 1995. Prior to the Merger, Defendant Ciampa served as a member of NYCB's Audit Committee, Nominating and Corporate Governance Committee, and Risk Assessment Committee. Defendant Ciampa left the Board in connection with the Merger. Defendant Ciampa reviewed, contributed to, and signed the Offering Documents.

38. Defendant Hanif W. Dahya ("Dahya") was a Director of NYCB from March 2007 until he resigned in February 2024. Leading up to the Merger, Dahya was the Chairman of NYCB's Compensation Committee and a member of the Audit Committee, Nominating and Corporate Governance Committee and the Risk Assessment Committee. At that time, Dahya was designated as a "Risk Committee Expert", pursuant to the Dodd-Frank Act. Defendant Dahya reviewed, contributed to, and signed the Offering Documents.

39. Defendant Leslie D. Dunn ("Dunn") was a Director of NYCB from 2015 until her resignation, effective March 11, 2024. Leading up to the Merger, Dunn was Chairwoman of NYCB's Nominating and Corporate Governance Committee and a member of the Compensation committee, Audit Committee and Risk Assessment Committee. Defendant Dunn reviewed, contributed to, and signed the Offering Documents.

40. Defendant James J. O'Donovan ("O'Donovan") was a Director of NYCB since 2003. O'Donovan served as the Chairman of NYCB's Credit Committee. Defendant O'Donovan reviewed, contributed to, and signed the Offering Documents.

41. Defendant Lawrence Rosano, Jr. ("Rosano") was a Director of NYCB from July 2014 until his resignation, effective March 11, 2024. Leading up to the Merger, O' Donovan served

as the Chairman of NYCB's Credit Committee. Rosano left the Board in connection with the Merger. Defendant Rosano reviewed, contributed to, and signed the Offering Documents.

42. Defendant Ronald A. Rosenfeld ("Rosenfeld") was a Director of NYCB from January 2012 until he resigned, effective March 11, 2024. Leading up to the Merger, Rosenfeld served as a member of NYCB's Audit Committee, Nominating and Corporate Governance Committee, and Risk Assessment Committee. Defendant Rosenfeld reviewed, contributed to, and signed the Offering Documents.

43. Defendant Lawrence J. Savarese ("Savarese") was a Director of NYCB from March 2013 until his resignation, effective March 11, 2024. Leading up to the Merger, Savarese was the Chairman of NYCB's Audit Committee and served on the Compensation Committee, Risk Assessment Committee, and Credit Committee. Savarese was designated an Audit Committee Financial Expert under SEC rules and a Risk Committee Expert pursuant to the Dodd-Frank Act. Defendant Savarese reviewed, contributed to, and signed the Offering Documents.

44. The defendants named in ¶¶ 32-43 are referred to as the "Individual Defendants." NYCB and the Individual Defendants are collectively referred to as "Defendants." Each of the Individual Defendants signed or was identified as current or incoming director (or person performing similar functions) in the Registration Statement, as amended, solicited the purchase of securities issued pursuant thereto, planned and contributed to the Merger and Offering Documents, and engaged in road show and other promotional events to meet with and present favorable information to NYCB and Flagstar investors.

45. Further, as members of NYCB's Risk Assessment Committee, Defendants Ciampa, Dahya, Dunn, Rosano, Rosenfeld, and Savarese were tasked with assisting the Board in fulfilling its responsibilities "with respect to oversight of the Company's risk management

program[.]" The Bank's Risk Assessment Committee was responsible for, *inter alia*, oversight of risk management activities through "active and frequent engagement" and for "designing, implementing, and maintaining an effective risk management program."

### DEFENDANTS' FALSE AND MISLEADING OFFERING DOCUMENTS

46.     On April 26, 2021, NYCB and Flagstar jointly announced that they had entered into a definitive merger agreement under which the two companies would combine in an all-stock merger. Under the terms of the merger agreement, Flagstar stockholders would receive 4.0151 shares of NYCB common stock in exchange for each Flagstar share they own. In lieu of fractional shares, NYCB would issue cash in the Merger.

47.     On June 11, 2021, NYCB filed with the SEC a preliminary registration statement on Form S-4. On June 24, 2021, NYCB filed an amendment to the registration statement on Form S-4/A with the SEC. The SEC declared the registration statement effective on June 25, 2021. The amended registration statement incorporated by reference, among other documents, NYCB's annual report on Form 10-K for the year ended December 31, 2021; NYCB's proxy statement on Schedule 14A filed with the SEC on April 16, 2021; NYCB's quarterly report on Form 10-Q for the quarter ended March 31, 2021; and NYCB's current reports on Form 8-K and 8-K/A, filed with the SEC on January 6, 2021, January 27, 2021 (only with respect to Item 8.01), March 26, 2021, March 31, 2021, April 26, 2021, April 26, 2021, and May 7, 2021.

48.     On June 17, 2021, the SEC filed a letter that advised Defendants that the SEC had not reviewed and would not review the registration statement.

49.     The SEC declared the registration statement effective on June 25, 2021.

50.     On June 25, 2021, NYCB filed a joint proxy statement and prospectus on Form 424B3. Subsequently, NYCB filed several prospectus supplements, including on July 29, 2021,

July 30, 2021, August 12, 2021, November 3, 2021, November 4, 2021, February 2, 2022, and March 4, 2022.

51.     On April 26, 2022, the companies amended the Merger Agreement in part to change the structure of the Merger, which affected the regulatory approval needed from both the FDIC and the New York Department of Financial Services ("NYDFS") and ensured that the OCC would be the entity to provide the appropriate regulatory approval. According to an article published in *Reuters* on March 7, 2024, the FDIC had privately vetoed the Merger over concerns about the banks' lending practices. According to sources, the FDIC were worried about NYCB's fair lending practices and were also worried about the exposure of some of NYCB's multifamily loans. But before the FDIC could formally block the deal, the banks announced that they were restructuring the Merger so that NYCB would merge into Flagstar, which was regulated by the OCC, ensuring that the FDIC's approval was no longer necessary. While the OCC had concerns, the article reported, it approved the Merger with the unusual provision that the post-Merger bank seek the agency's approval before paying dividends.

52.     On August 3, 2022, NYCB filed a post-effective Amendment No. 1 to the Registration Statement on Form S-4 originally declared effective by the SEC on June 25, 2021: (i) to update the pro forma condensed combined financial information that was originally included in the Joint Proxy Statement/Prospectus, (ii) to incorporate by reference the information contained in NYCB's and Flagstar's 2021 Form 10-K, and (iii) to update the Joint Proxy Statement/Prospectus to incorporate by reference the information contained in certain other documents regarding NYCB and Flagstar that NYCB and Flagstar, respectively, have filed and will from time to time file with the SEC. The filing was signed by the Individual Defendants.

53.     On September 28, 2022, NYCB filed post-effective Amendment No. 2 to the Registration Statement on Form S-4 as originally declared effective by the SEC on June 25, 2021, to also update certain information in the Registration Statement and include certain information required to be included in a registration statement on Form S-4 in response to SEC comments that NYCB include all disclosures required by Form S-4. The filing was signed by the Individual Defendants.

54.     On October 11, 2022, the SEC declared the Registration Statement, as amended, effective.

55.     On October 12, 2022, NYCB filed an amended prospectus on Form 424B3 (which forms part of the Registration Statement or Offering Documents) for the NYCB shares issued and exchanged for Flagstar shares in the Merger.

56.     On December 1, 2022, Defendants completed the Merger, issuing approximately 214 million new shares of NYCB common stock directly to former shareholders of Flagstar, including Plaintiff. On that date, Flagstar shareholders received NYCB common stock in exchange for their Flagstar shares pursuant to the terms of the Merger. The final closing price of Flagstar stock on November 30, 2022 was $37.54 per share.

57.     The Offering Documents filed and disseminated to stockholders in the Merger were materially false and misleading and omitted material facts both required by governing SEC regulations and necessary to make the statements made not misleading as described herein.

58.     The Offering Documents misrepresented and omitted material facts regarding the effectiveness of NYCB's internal controls over financial reporting. In truth, at the time of the Merger, NCYB already lacked effective internal controls over financial reporting, and already

suffered material weaknesses in its internal controls for, *inter alia*, tracking loan risks as well as ineffective oversight, risk assessment, and monitoring.

59.     The Offering Documents, which incorporated by reference various periodic SEC filings, were peppered with reassurances that NYCB's portfolio assets were of exceptional quality. In NYCB's Form 10K for the fiscal year ended December 31, 2021 ("2021 10K"), which is incorporated in the Offering Documents, Defendants made false and misleading statements and omitted material facts about the Company's CRE loan portfolio asset quality. The 2021 10K was insistent that NYCB had "exceptional asset quality" and that its "asset quality metrics remain strong."

60.     In addition, the second quarter 2022 Form 10-Q also portrayed the Company's assets as being excellent, stating:

> ***Nonperforming assets of $56 million***, equal to nine basis points (0.09%) of total assets ($63.1 billion);
>
> ***Non-performing loans of $50 million***, equal to ten basis points (0.10%) of total loans ($48.5 million);
>
> ***Total loans past due 30 to 89 days of $30 million***;
>
> ***ACL of $216 million***, representing 434% of total non-performing loans and 0.45% of total loans ($48.5 billion);
>
> ***PCL of $9 million***;
>
> ***Net charge-offs (recoveries) of ($7 million)***.

61.     While the 2021 Form 10K stated that NYCB's concentration in multi-family loans and CRE loans "could" expose the Company to increased loan losses, it lacked a reasonable basis to make that qualifying statement when made. Defendants ultimately revealed it completely lacked any effective controls over its internal loan review processes and as such, NYCB was unable to timely identify and respond to financial reporting risks. As a result, the Company reported $683

million in non-GAAP net losses for the fourth quarter of 2023 through the second quarter of 2024, attributable to a staggering increase in the company's provision for credit losses of $1.257 billion over those three quarters. Moreover, NYCB's Allowance for Credit Losses ("ACL") and Provision for Credit Losses ("PCL") violated GAAP and net income was inflated because of NYCB's inability to "accurately disclose loan rating classifications" and identify problem loans which impacted NYCB's recognition of allowance for credit losses on loans and leases. The application of only a quarter of the $1.257 billion increase to PCL to earlier periods would have resulted in a $39 million reduction in NYCB's net income in the second quarter of 2022 and resulted in NYCB missing analysts' consensus estimates.

62.     NYCB's Form 10-K for the fiscal year ended December 31, 2021 ("2021 10K"), which was incorporated by reference into the Offering Documents, represented that the Company had effective and sound risk management practices. Specifically, NYCB stated:

> **The Company's and the Bank's Boards of Directors are actively engaged in the process of overseeing the efforts made by the Enterprise Risk Management department to identify, measure, monitor, mitigate, and report risk.** The Company has established an ERM program that reinforces **a strong risk culture to support sound risk management practices. The Board is responsible for the approval and oversight of the ERM program and framework.**
>
> ERM is responsible for setting and aligning the Company's Risk Appetite Policy with the goals and objectives set forth in the budget, and the strategic and capital plans. **Internal controls and ongoing monitoring processes capture and address heightened risks that threaten the Company's ability to achieve our goals and objectives, including the recognition of safety and soundness concerns and consumer protection. Additionally, ERM monitors key risk indicators against the established risk warning levels and limits, as well as elevated risks identified by the Chief Risk Officer.**

63.     The statements identified above were materially false, misleading and omitted material facts. As NYCB would later reveal, NYCB and NYCB's Board had failed to exercise oversight responsibilities; NYCB lacked an effective control environment due to a lack of

resources and qualified employees to assess and monitor risks; NYCB had ineffective processes for timely identifying and responding to financial reporting risks, including risks arising from changes in the business, regulatory and economic environments, such as internal loan reviews; and NYCB had ineffective monitoring activities, including for internal loan reviews. Specifically, Defendants noted that the Company and its Board were **not** "actively engaged in the process of overseeing the efforts made by the Enterprise Risk Management department to identify, monitor, mitigate, and report risk".

64.     In addition NYCB the ERM program did not "reinforce[] a strong risk culture to support sound risk management practices;" "internal controls and ongoing monitoring processes" did not "capture and address heightened risks that threaten the Company's ability to achieve our goals and objectives;" and the Company's ERM department did not "monitor key risk indicators against the established risk warning levels and limits."

65.     Indeed, NYCB already lacked effective controls over internal loan review processes because the Company lacked an appropriate framework to ensure that ratings were accurate, timely, and appropriately challenged. NYCB's ineffective internal controls not only undercut its ability to, among other matters, identify problem loans, it ultimately crippled the Company's timely recognition of the allowance for credit losses on loans and leases.

66.     On May 1, 2024, the new CEO at NYCB stated that NYCB lacked "good risk management infrastructure" and that he and new management needed to "clean up our house and get it in order" as "we build infrastructure here". On that same call NYCB's new CFO acknowledged that even after two months of work, NYCB's "internal infrastructure" "has a lot of improvement to go and we continue to work on those actions plans".

67. The Company's April 22, 2022 Definitive Proxy Statement, which was incorporated by reference into the Offering Documents stated in part:

Management of risk is important to the success of our operations and business strategies **and our Board devotes significant attention to the oversight of risks inherent in our banking business, including, but not limited to, information security risk, credit risk, model risk, interest rate risk, liquidity risk, operational risk, strategic risk, compliance risk and reputational risk.**

The Board reviews the key risks associated with the Company's strategic plan annually and regularly throughout the year as part of its consideration of the strategic direction of the Company as well as reviewing the output of the Company's risk management processes each year and reviewing risks associated with specific business units and corporate functions.

***While the Board of Directors as a whole is responsible for risk management oversight, management is responsible for the day-to-day management of the risks faced by the Company. As part of our risk oversight processes, our Chief Risk Officer reports to the Risk Assessment Committee; the Chairman of the Board's Risk Assessment Committee meets regularly with management to discuss the risks facing the Company and strategies to address these risks; and senior members of management attend Board meetings and are available to address questions or concerns raised by the Board on risk management and other matters.*** In carrying out its responsibilities in this area, the Board has delegated important duties to its committees.

The Risk Assessment Committee has responsibility to oversee the functioning of the Company's enterprise risk management program and ***to ensure that risk is appropriately identified, measured, mitigated, monitored, and reported within approved governance structures***. Among its duties, the Risk Assessment Committee reviews with management Company policies regarding risk assessment and management of risks that may be material to the Company, the Company's system of disclosure controls and system of internal controls over financial reporting, the Company's governance structure and processes, related person transactions, certain compliance issues and Board and committee structures, and the Company's compliance with legal and regulatory requirements.

68. These statements identified in the Definitive Proxy Statement were materially false, misleading, and omitted material facts. The Board, including its Risk Assessment Committee, did not exercise sufficient oversight responsibilities, which led to the Company lacking a sufficient complement of qualified leadership resources to conduct effective risk assessment and monitoring

activities. NYCB also lacked effective periodic risk assessment processes to identify and timely respond to emerging risks in certain financial reporting processes and related internal controls, including internal loan review, that were responsive to changes in the business operations and regulatory and economic environments in which the Company operates.

69.     The Offering Documents also falsely attested that NYCB financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"). In truth, the financial statements incorporated into the Offering Documents violated GAAP in myriad respects. For example, Defendants had failed to properly account for goodwill from NYCB's historical transactions (2007 and prior), which was already materially impaired ahead of the Merger. Instead of properly testing and timely accounting for the already existing and internally apparent impairment of goodwill as required by GAAP, Defendants materially understated NYCB's expenses and losses and materially overstated NYCB's income from operations, goodwill, and total assets in contravention of GAAP.

70.     Defendants further violated GAAP by failing to timely conduct reasonable goodwill impairment testing that adequately incorporated all events and changes in circumstances. Defendants also made false and misleading representations in NYCB's Offering Documents regarding goodwill impairment testing policies, procedures, and practices. Had Defendants reasonably conducted goodwill impairment testing as required by GAAP, the financial statements incorporated into the Offering Documents would have accounted for and disclosed NYCB's already existing and internally apparent material impairment of goodwill and related assets.

71.     Furthermore, as a result of Defendants' unreasonable failure to properly conduct goodwill impairment testing and timely account for already internally apparent goodwill impairment, the Offering Documents materially overstated goodwill and total assets on its balance

sheet, understated operating expenses, overstated income from operations, and understated net loss. Accordingly, Defendants' false and misleading representations and omissions in the Offering Documents that goodwill was not impaired, as well as with respect to other financial metrics, were materially false and misleading and did not fairly align with the information in Defendants' possession.

72. The Offering Documents were rife with additional misrepresentations and omissions. For example, Defendants misrepresented the effectiveness of NYCB's underwriting and risk management systems - characterizing them as "rigorous," "stringent," and "conservative." In truth, NYCB's underwriting and risk management systems were not rigorous, stringent, or conservative, but were ineffective and suffered from material weaknesses. The Offering Documents' representations about NYCB's underwriting and risk management systems and protocols were false and misleading because, *inter alia*, NYCB lacked the "conservative lending policies" and "rigorous underwriting standards" that it touted. NYCB's loan portfolio was already rife with vulnerable assets, including poor quality commercial real estate ("CRE") and multifamily loans, and NYCB did not "originate CRE loans in adherence with conservative underwriting standards." These concerns would have caused the FDIC to formally veto the deal had the banks not restructured the Merger.

73. Moreover, the Offering Documents misrepresented the regulatory process following the April 26, 2022 Amended Merger Agreement, which changed the structure of the Merger to bypass the FDIC and its approval to the approval by the OCC. The Offering Documents stated that "neither NYCB nor Flagstar knows of any reason why it cannot obtain the regulatory approvals required to consummate the transactions contemplated by the merger agreement in a timely manner." The Offering Documents also stated that "NYCB and Flagstar believe that the

merger does not raise significant regulatory concerns and that they will be able to obtain all requisite regulatory approvals." These statements were materially false and misleading, omitted significant facts, including the fact that the FDIC had informally vetoed the transaction, and lacked a reasonable basis when made.

74.    In fact, Defendants failed to disclose that the change in regulatory approvals was due to the FDIC's opposition to the merger due to the banks' lending practices and NYCB's exposure to multi-family loans. Defendants were obligated to fully, completely and truthfully disclose all material facts about this subject in order not to mislead investors.

75.    As of the Merger, NYCB's CRE portfolio already faced severe and compounding risks from interest rate hikes and vacancies, and its multifamily loans faced risks from rising interest rates and a 2019 law in New York that capped the amounts that landlords could raise rents at the rent-stabilized properties. As was later gradually revealed, NYCB's prospective loan losses ballooned and, as a consequence, it needed to take a $552 million provision for credit losses in connection with its CRE and multi-family portfolio. Indeed, NYCB had material weaknesses in its underwriting systems and risk management protocols.

76.    SEC Regulation S-K, 17 C.F.R. §229.105, Risk Factors, ("Item 105"), required, in the "Risk Factor" section of the Registration Statement, a discussion of the most significant factors that made the offering risky or speculative, and that each risk factor adequately describe the risk. NYCB's risk factors did not even mention, much less adequately describe, the severe risks posed by NYCB's ineffective internal controls over financial reporting, nor did they discuss NYCB's already ineffective tracking of loan risks, NYCB's already ineffective oversight, risk assessment, and monitoring activities, NYCB's already ineffective and materially deficient underwriting and risk management systems, NYCB's already vulnerable loan portfolio assets including poor quality

commercial real estate and multifamily loans, NYCB's already impaired goodwill from NYCB's historical transactions (2007 and prior) as of the Merger, or that NYCB's financial statements violated GAAP in numerous respects. To the extent the Offering Documents made any passing reference to these risks whatsoever, it did so only in vague, generic, and non-specific terms that did not disclose the true scope and severity of material risks posed, much less adequately describe those risks as required by Item 105.

77.     The obligations imposed by Item 105 required the Offering Documents to disclose that NYCB (a) "lacked effective periodic risk assessment processes to identify and timely respond to emerging risks in certain financial reporting processes and related internal controls, including internal loan review, that were responsive to changes in the business operations and regulatory and economic environments in which the Company operates;" (b) NYCB lacked "leadership resources to conduct effective risk assessment and monitoring activities," and lacked "effective" "recurring monitoring activities over process level control activities, including internal loan review;" (c) NYCB's internal loan review processes operated without an appropriate risk management "framework to ensure that ratings were consistently accurate, timely, and appropriately challenged," which meant that the Company lacked the "ability to accurately disclose loan rating classifications, identify problem loans, and ultimately the recognition of the allowance for credit losses on loans and leases," and (d) that this would cause NYCB to slash dividends if and when the Company was forced to reveal that their misleading statements and omissions about weaknesses in the Company's internal controls and threatened regulatory approval for the Merger had inflated its Class Period results.

78.     Separately, Item 105 also required disclosure of the trends and uncertainties related to regulatory concerns regarding the Merger, the reasons for NYCB and Flagstar's pivot to OCC

approval, and NYCB's underwriting standards and exposure to multi- family loans. It was misleading for Defendants to discuss the Company's "prudent" credit standards for underwriting and lending practices while failing to provide fully the information required that NYCB lacked the ability to accurately disclose loan rating classifications, identify problem loans, and ultimately the recognition of allowance for credit losses on loans and leases, and that this would cause NYCB to slash dividends if and when the Company was forced to, or chose to, reveal that their misleading statements and omissions about NYCB's weaknesses in internal controls had inflated its financial results.

79.     Defendants' failure to disclose the material information described above, much less the materially adverse effects of the undisclosed information on the Company's future results, share price, and prospects, rendered false and misleading the Offering Documents' many references to risks.

### DEFENDANTS' MISSTATEMENTS AND OMISSIONS WERE MATERIAL

80.     On January 31, 2024, NYCB issued a press release announcing financial results revealing it had recorded a $552 million provision for loan losses and reporting a 4Q23 net loss of $252 million. NYCB attributed this loss "primarily" to "higher net charge-offs, as well as, to address weaknesses in the office sector, potential repricing risk in the multi-family portfolio, and an increase in classified assets." The release also stated that NYCB was cutting its quarterly dividends by 70% from $0.17 per share to $0.05 per share.

81.     On this news, shares of NYCB plunged by 38% to close at $6.47. As the Wall Street Journal reported on January 31, 2024:

> Shares of New York Community Bancorp plummeted 38% Wednesday after the company swung to a fourth-quarter loss and slashed its dividend to shore up capital following its purchase of the assets of the collapsed Signature Bank.

*     *     *

Loan losses surged, and the bank set aside millions of dollars more to prepare for future potential losses.

The stock fell 38% Wednesday, closing at $6.47, its worst day on record.

82.     On February 6, 2024, rating agency Moody's downgraded NYCB's long-term and short-term issuer ratings to junk and cautioned of further downgrades.

83.     That day, in a press release, Defendant Cangemi told investors that NYCB was taking steps to enhance its risk management processes, including by replacing the Company's chief risk officer and chief audit executive with those who have large bank experience:

> We took decisive actions to fortify our balance sheet and strengthen our risk management processes during the fourth quarter. Our actions are an investment in enhancing a risk management framework commensurate with the size and complexity of our bank and providing a solid foundation going forward. Despite the Moody's ratings downgrade, our deposit ratings from Moody's, Fitch and DBRS remain investment grade. The Moody's downgrade is not expected to have a material impact on our contractual arrangements.
>
> Finally, as part of the bank's **enhancements to its risk management processes** we have been engaged in an orderly process of **bringing in a new chief risk officer and chief audit executive with large bank experience** and we currently have qualified personnel filling those positions on an interim basis."

[Emphasis added.]

84.     On February 29, 2024, NYCB disclosed in SEC filings a goodwill impairment of a staggering $2.4 billion, material weaknesses in its internal controls from ineffective oversight, risk assessment, and monitoring activities, and revealed that it would be unable to file its 2023 Form 10-K on time:

> The Company completed its goodwill impairment assessment on February 23, 2024 and **management determined that Generally Accepted Accounting Principles required a "goodwill impairment" charge on the Company's "Consolidated Statements of Income and Comprehensive Income" for the quarter and fiscal year ended December 31, 2023, resulting in a $2.4 billion decrease to the fourth quarter and annual net (loss) income available to common stockholders. The Company also adjusted the balances of "goodwill" on the "Consolidated Statements of Condition" as of December 31, 2023 for that same amount**.

25

The Company utilized a market approach to estimate the fair value of its sole reporting unit as of December 31, 2023, related to identified triggering events. ***The Company's assessment concluded that goodwill from historical transactions (2007 and prior) was fully impaired*** as of December 31, 2023, as confirmed by the Company's current market capitalization.

\* \* \*

Separately, as part of management's assessment of the Company's internal controls, ***management identified material weaknesses in the Company's internal controls related to internal loan review, resulting from ineffective oversight, risk assessment and monitoring activities***. Although assessment of the Company's internal controls is not yet complete, the Company expects to disclose in the 2023 Form 10-K that its disclosure controls and procedures and internal control over financial reporting were not effective as of December 31, 2023. The Company's remediation plan with respect to such material weaknesses is expected to be described in the 2023 Form 10-K.

\* \* \*

***The Company will note that it has determined that it will be unable to file the 2023 Form 10-K with the SEC*** within the prescribed time period without unreasonable effort or expense. The Company expects to file its 2023 Form 10-K within the fifteen calendar day grace period provided by Form 12b-25.

[Emphasis added.]

85.     The trading price of NYCB common stock suffered sharp declines following this news, falling to a close of $3.55 per share on March 1, 2024, and $2.73 per share on March 4, 2024. On March 6, 2024, trading halted as NYCB shares further plunged and traded as low as $1.70.

86.     On March 6, 2024, NYCB entered into separate agreements with Liberty Strategic Capital, Hudson Bay Capital, Reverence Capital Partners, Citadel Global Equities, other institutional investors and certain members of Company management to make a combined investment of over $1 billion in NYCB. Liberty is led by Steven Mnuchin. In addition, NYCB announced a series of changes to management and the Board.

87.     On March 14, 2024, NYCB belatedly filed its 2023 Form 10-K. Among other matters, the 2023 Form 10-K represented that NYCB's CEO and CFO had concluded that NYCB disclosure controls and procedures were not effective because of the material weaknesses in the Company's internal control over financial reporting:

> As of December 31, 2023, management assessed the effectiveness of the Company's internal control over financial reporting based upon the framework established in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). A material weakness (as defined in Rule 12b-2 under the Exchange Act) is a deficiency or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement in our annual or interim financial statements will not be prevented or detected on a timely basis.
>
> ***Based on this assessment, because of the following material weaknesses, management concluded that the Company did not maintain effective internal control over financial reporting*** as of December 31, 2023.
>
> *Control environment -* ***Our Board of Directors did not exercise sufficient oversight responsibilities, which led to us lacking a sufficient complement of qualified leadership resources to conduct effective risk assessment and monitoring activities.***
>
> *Risk assessment -* ***We lacked effective periodic risk assessment processes to identify and timely respond to emerging risks in certain financial reporting processes and related internal controls, including internal loan review, that were responsive to changes in the business operations and regulatory and economic environments in which the Company operates.***
>
> *Monitoring -* ***Our recurring monitoring activities over process level control activities, including internal loan review, were not operating effectively.***
>
> *Control activities -* ***We did not sufficiently maintain effective control activities related to internal loan review****.* Specifically, our internal loan review processes lacked an appropriate framework to ensure that ratings were consistently accurate, timely, and appropriately challenged. ***These ineffective controls impact the Company's ability to accurately disclose loan rating classifications, identify problem loans, and ultimately the recognition of the allowance for credit losses on loans and leases.***
>
> These control deficiencies create a reasonable possibility that a material misstatement to the consolidated financial statements will not be prevented or

detected on a timely basis, and therefore we concluded that the deficiencies represent material weaknesses in our internal control over financial reporting and our internal control over financial reporting was not effective as of December 31, 2023.

The Company's independent registered public accounting firm, KPMG LLP, which audited the 2023 consolidated financial statements included in this Form 10-K, has expressed an adverse opinion on the effectiveness of the Company's internal control over financial reporting.

[Emphasis added.]

88.     The 2023 Form 10-K also set forth the following regarding the steps taken to remediate NYCB's ineffective internal controls and material weaknesses:

The Company is currently working to remediate the material weaknesses described above, including assessing the need for additional remediation steps and implementing additional measures to remediate the underlying causes that gave rise to the material weaknesses. The Company is committed to maintaining a strong internal control environment and to ensuring that proper oversight and a consistent tone is communicated throughout the organization. The Company expects that existing deficiencies will be remediated through implementation of processes and controls designed to ensure strict compliance with U.S. GAAP.

Specifically, we are in the process of strengthening our internal control over financial reporting as follows:

•   Appointed several new members to the Board of Directors with extensive experience as financial experts in our industry and backgrounds in risk management. Additionally, several members of the Board of Directors resigned.

•   Appointed a new Chief Risk Officer and Chief Audit Executive, both of whom have large bank experience. We are in the process of identifying and appointing a new Director of Loan Review who has prior large bank commercial loan experience.

•   Increasing the frequency and nature of reporting from our internal loan review team and first line business units to the Board Risk Committee to support the Board's risk oversight role.

•   Expanding the use of independent credit analysis and reducing the Company's reliance on tools and analysis prepared by our lines of business.

•   Improving the internal loan review team's ability to independently challenge risk rating scorecard model methodologies and results.

- Assessing the adequacy of staffing levels and expertise within the internal loan review program, taking into account, among other things, the size, complexity, and risk profile of the Company's loan portfolio.
- Providing additional risk rating process training for all internal loan review employees.

We have enhanced our control environment, risk assessment and monitoring activities by addressing our Board composition and key members of executive management, including the Chief Risk Officer and Chief Audit Executive. Progress has been made on our remedial actions, but we are still in the process of developing and implementing enhanced processes, procedures and controls related to internal loan review. We believe our actions will be effective in remediating the material weaknesses, and we continue to devote significant time and attention to these efforts. In addition, the material weaknesses will not be considered remediated until the applicable remedial processes, procedures and controls have been in place for a sufficient period of time and management has concluded, through testing, that these controls are effective.

89.    The full scope of Defendants' misrepresentations and omissions has continued to emerge over time from a series of disclosures, the massive infusion of capital from a group of investors, executive and Board departures, dividend cuts, and other materialization of risks, and related stock price declines. Plaintiff and other former Flagstar investors have suffered severe losses as a result of Defendants' misconduct.

90.    As of the commencement of this action, NYCB shares have plummeted approximately 80% from the amount paid pursuant to the Merger.

## CLASS ACTION ALLEGATIONS

91.    Plaintiff brings this action as a class action on behalf of all persons who acquired NYCB common stock directly in the Merger pursuant to the Offering Documents (the "Class"). Excluded from the Class are Defendants and their families, the former and present officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had controlling interest.

92.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands or even hundreds of thousands of members in the proposed Class. Members of the Class may be identified from records maintained by Defendants or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

93.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of law that is complained of herein.

94.     Plaintiff will fairly and adequately protect the interest of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

95.     Common questions of law and fact exist as to all members of the Class and predominance over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        a)      whether Defendants violated the Securities Act;

        b)      whether the Offering Documents were negligently prepared and contained inaccurate statements of material fact and omitted material information required to be stated therein, except as to the issuer who is not required to have acted with negligence; and

        c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

96.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of all members is impracticable, and the damages suffered

by individual Class members are relatively small as compared with Defendants' combined resources. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. Class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.

## FIRST CAUSE OF ACTION
### FOR VIOLATION OF §11 OF THE SECURITIES ACT AGAINST ALL DEFENDANTS

97.     Plaintiff incorporates all the foregoing by reference.

98.     This Cause of Action is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

99.     This Cause of Action alleges and sounds in strict liability and expressly excludes and disclaims any allegation that could be construed as alleging fraudulent intent, as this Cause of Action is solely based on claims of strict liability and/or negligence under the Securities Act. This Cause of Action does not sound in fraud and Plaintiff expressly disavows and disclaims any allegation that Defendants acted with scienter or fraudulent intent, which, along with reliance, are not elements of a claim under §11 of the Securities Act.

100.    The Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

101.    Defendants are strictly liable to Plaintiff and the Class for the misstatements and omissions in the Offering Documents.

102. Defendant NYCB is the issuer of the stock sold in the Merger. As the issuer, NYCB is strictly liable to Plaintiff and the Class under §11 for the material misrepresentations and omissions in the Registration Statement, as amended, and the failure of the Registration Statement to be complete and accurate.

103. The Individual Defendants each signed or were named as Directors or incoming Directors in the Offering Documents. As such, each is strictly liable for the material misrepresentations in the Offering Documents and the failure of the Offering Documents to be complete and accurate. Each Individual Defendant had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents and ensure that the representations in the Offering Documents were true and accurate, that there were no omissions of material facts that would render the Offering Documents misleading, and that the Offering Documents contained all facts required to be stated therein. In the exercise of reasonable care, the Individual Defendants should have known of the material misrepresentations and omissions contained in the Offering Documents and should have known of the omissions of material facts necessary to make the statements made therein not misleading or otherwise required to be stated therein. Accordingly, the Individual Defendants are liable to Plaintiff and the Class under §11 for the material misrepresentations and omissions in the Offering Documents, and the failure of the Offering Documents to be complete and accurate.

104. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

105. By reason of the conduct herein alleged, each Defendant violated, or controlled an employee, agent, or other person who violated, §11 of the Securities Act.

106.     Plaintiff acquired NYCB shares directly in the Merger pursuant to the Offering Documents and without knowledge of the untruths and omissions contained therein.

107.     Plaintiff and the Class have sustained damages. The value of NYCB common stock has declined substantially subsequent to, and due to, Defendants' violations.

108.     This Cause of Action is brought within one year after the discovery of the untrue and misleading statements and omissions at issue and within three years of the date of the offering.

109.     By virtue of the foregoing, Plaintiff and Class members are entitled to damages under §11, as measured by the provisions of §11(e), as well as any and all remedies that may exist in equity or at law.

## SECOND CAUSE OF ACTION
### For Violation of §12(a)(2) of the Securities Act Against All Defendants

110.     Plaintiff incorporates all the foregoing allegations by reference.

111.     This Cause of Action is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of the Class against all Defendants.

112.     This Cause of Action alleges and sounds in strict liability. This Cause of Action expressly excludes and disclaims any allegation that could be construed as alleging fraudulent intent, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. This Cause of Action does not sound in fraud and Plaintiff expressly disavows and disclaims any allegation that Defendants acted with scienter or fraudulent intent, which, along with reliance, are not elements of a claim under §12(a)(2) of the Securities Act.

113.     By means of the prospectus and related oral communications, Defendants promoted, solicited, and sold NYCB shares to Plaintiff and Class members. Defendants were sellers to, and direct solicitors of, purchasers of the Company's securities offered pursuant to the offering. Defendants issued, caused to be issued, or signed or authorized the signing of the

prospectus and related oral communications in connection with the offering, and used it to directly induce investors, including Plaintiff and the other Class members, to purchase the Company's shares.

114. The prospectus and related oral communications contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendants' acts of solicitation included participating in the preparation, dissemination, and promotion of the false and misleading prospectus and related oral communications directly to Plaintiff and Class members.

115. Defendants owed Plaintiff and the other members of the Class the duty to make a reasonable and diligent investigation of the statements contained in the prospectus to ensure that such statements were true, that there was no failure to state a material fact required to be stated in order to make the statements contained therein not misleading, and that statements required to be made were not omitted. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the prospectus and related oral communications as set forth above.

116. Plaintiff did not know, nor in the exercise of reasonable diligence could he have known, of the untruths and omissions contained in the prospectus and related oral communications at the time Plaintiff acquired NYCB shares.

117. By reason of the conduct of the conduct alleged herein, Defendants violated, or controlled an employee, agent, or other person who violated, §12(a)(2) of the Securities Act.

118. As a direct and proximate result of such violations, Plaintiff and the other members of the Class received NYCB shares pursuant to the prospectus and sustained substantial damages in connection with their purchases of the stock. Accordingly, Plaintiff and the other members of

the Class who hold the common stock issued directly pursuant to the Offering Documents have the right to rescind and recover the consideration paid for their shares, and hereby tender their NYCB common stock to Defendants sued herein. Class members who have sold their common stock seek damages. All class members further seek equitable and other remedies to the extent permitted in equity or at law.

119.    This claim is brought within one year after the discovery of the untrue and misleading statements and omissions at issue and within three years of the date of sale to Plaintiff and Class members.

### THIRD CAUSE OF ACTION
### For Violation of §15 of the Securities Act Against All Defendants

120.    Plaintiff incorporates all the foregoing by reference.

121.    This Cause of Action is brought pursuant to §15 of the Securities Act, Act, 15 U.S.C. §77o, against all Defendants.

122.    This Cause of Action avers and sounds in strict liability. This Cause of Action expressly excludes and disclaims any allegation that could be construed as alleging fraud or scienter, as this cause of action is solely based on claims of strict liability and/or negligence under the Securities Act. This Cause of Action does not sound in fraud and Plaintiff expressly disavows and disclaims any allegation that Defendants acted with scienter or fraudulent intent, which, along with reliance, are not elements of a claim under §15 of the Securities Act.

123.    NYCB controlled the Individual Defendants and all of NYCB's employees. NYCB orchestrated and negotiated the Merger.

124.    The Individual Defendants were controlling persons of NYCB and/or Flagstar, or NYCB or Flagstar employees or agents, by virtue of their positions as directors or senior officers

of NYCB or Flagstar. The Individual Defendants each had a series of direct or indirect business or personal relationships with other directors or officers or major shareholders of NYCB or Flagstar.

125.    By reason of the wrongful conduct set forth above, each Defendant was a culpable participant in the violations of §§11 and 12(a)(2) of the Securities Act alleged above, and also liable pursuant to §15 of the Securities Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.    Certifying this action as a class action, and appointing Plaintiff as a Class representative;

B.    Awarding damages in favor of Plaintiff and the Class against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable cost and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding rescission, disgorgement, or such other equitable or injunctive relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: December 19, 2024                                Respectfully submitted,

                                                        **THE PASKOWITZ LAW FIRM P.C.**

                                                        */s/ Laurence D. Paskowitz*
                                                        Laurence D. Paskowitz
                                                        The Contour
                                                        97-45 Queens Boulevard, Ste. 1202
                                                        Rego Park, NY 11374
                                                        T: 212-685-0969
                                                        lpaskowitz@pasklaw.com

**KOMLOSSY LAW P.A.**
Emily Komlossy
3440 Hollywood Boulevard, Ste. 415
Hollywood, FL 33021
T: (954) 842-2021
F: (954) 416-6223
eck@komlossylaw.com

*Counsel for Plaintiff*

# CERTIFICATION OF PLAINTIFF

I, Robert Garfield ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed a draft of his Complaint (the "Complaint") and has authorized the filing of a Complaint substantially similar to the one reviewed.

2. Plaintiff did not purchase the security that is the subject of the Complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff sets forth in the attached chart all of his transactions in the security that is the subject of the Complaint, which reflects an exchange of his long held Flagstar shares for New York Community Bancorp shares automatically at the merger ratio upon the December 1, 2022 close of the merger of the two companies. Plaintiff received cash in leu of fractional shares.

5. In the past three years, Plaintiff has not moved to be nor has served as a representative party or lead plaintiff on behalf of a class in an action filed under the federal securities laws.

6. Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered, or as otherwise approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this December __ , 2024.

12 / 18 / 2024

*robert garfield*
_____
Signature

| Company Name/Ticker | Transaction (Buy or Sale) | Trade Date | Price | Quantity |
|---|---|---|---|---|
| NYCB (via Merger) | Buy via exchange | 12-1-22 | 9.19 | 40 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |